IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILMINGTON FINANCE, INC., | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| IMPERIAL MORTGAGE CORP., | : | NO.  08-1292 |
| Defendant | | |

## **MEMORANDUM AND ORDER**

In this diversity case Plaintiff Wilmington Finance, Inc. ("Wilmington"), sought to require Defendant Imperial Mortgage Corp. ("Imperial") to repurchase certain real estate loans and/or pay damages for breach of the parties' mortgage broker agreement. Presently before the court is Wilmington's Motion to Enforce Settlement (Doc. 21), Imperial's Memorandum of Law in opposition thereto (Doc. 22), and Wilmington's Reply (Doc. 26).  To resolve this matter, I must determine whether the parties reached an enforceable agreement as a result of settlement discussions held before me on July 17, 2008.[1]

---

[1] This matter was originally referred to me by the Honorable William H. Yohn Jr., United States District Judge for the Eastern District of Pennsylvania, for the purpose of holding a settlement conference, which occurred on July 17, 2008.  On July 24, 2008, prior to the filing of the present motion to enforce, Judge Yohn referred the case to me for all purposes upon the parties' consent to magistrate judge jurisdiction.  (Doc. 15). Because the parties do not dispute what occurred at the settlement conference, an evidentiary hearing is not needed and it will not be necessary for me to serve as a fact witness in this matter.  Therefore, I have not requested that another magistrate judge consider the present motion, nor have the parties requested that I do so.

I.      **FACTUAL BACKGROUND**

   A.      **The Settlement Discussions**

I convened a settlement conference in this matter on July 17, 2008. Frank Emmerich, Esquire, and Joy Sperling, Esquire, appeared as counsel for Wilmington, together with Wilmington Vice President Donald Griffin. Richard Harrison, Esquire, appeared for Imperial. Prior to the conference and without objection by Wilmington, I granted Mr. Harrison's request that Steven Holman, a principal for Imperial, participate in the conference by telephone.[2] No representative of Imperial appeared at the settlement conference in person.

At the outset of the conference, I met with the parties together. I learned that the three properties at issue were on the market and that Imperial was continuing to endeavor to find buyers for them, and also that each of the properties was in foreclosure and that Wilmington continued to be obligated on the mortgage notes. Each party stated an initial settlement proposal including payment terms and the possibility of a consent judgment. The question of Imperial's ability to satisfy a financial obligation and Wilmington's

---

[2]At both the settlement conference and during a telephone call on July 30, 2008, Mr. Harrison referred to Mr. Holman as President of Imperial. In the current motion papers, Imperial describes Mr. Holman as a "principal" of Imperial, whereas Wilmington believes him to be Vice-President of Imperial. See Def.'s Memo. at 2; Pl.'s Memo. at 2. As neither party has raised any question as to Mr. Holman's authority to bind Imperial in the settlement discussions, no fact issue must be resolved as to Mr. Holman's title.

desire to see records documenting Imperial's limited resources were also discussed from the outset.

After these initial settlement proposals were presented, I met with the parties individually, beginning with Imperial. During these discussions the parties proposed various and increasingly closer payment and security terms in an attempt to reach a settlement. On at least two occasions during these discussions, Mr. Harrison informed me that he had consulted via telephone with Mr. Holman, who authorized Mr. Harrison to convey the terms. The parties did reach agreement to terms during the conference, and Mr. Harrison confirmed that Mr. Holman approved the terms in a telephone call. With all parties together, I recited the following terms that the parties had agreed to:

1. Imperial would pay Wilmington the sum of $80,000, to be paid as follows: $2,000 a month over the following two months (due on August 15 and September 15); and $4,000 a month for each month thereafter until the entire amount was satisfied;

2. Imperial would have 120 days in which to sell the properties, with Wilmington's approval of the amount of the sale;[3]

3. Wilmington could continue to pursue the foreclosure proceedings; and

---

[3]One of the properties was already under contract, and Wilmington had approved the sale price.

    4.  Imperial would execute a consent judgment in Wilmington's favor in the amount of $500,000, which would be enforced only if Imperial failed to make payments in accordance with the agreed schedule and only after it received written notice and an opportunity to cure its default.

  The only contingency agreed to at the conference was that Imperial would provide financial information so that Wilmington could satisfy itself that Imperial was not in a position to pay more. Otherwise, it was understood by all that the parties had reached a settlement to end the legal action. It was also understood that counsel for Wilmington would draft the settlement papers and forward them to counsel for Imperial.

  At the end of the conference, I discussed with the parties how they would proceed with the case before Judge Yohn, who at that point was still the presiding judge. The parties had a conference call scheduled with Judge Yohn on July 30, 2008, and wanted to know whether the settlement would be finalized prior to that call. I scheduled a telephone status conference call with Ms. Sperling and Mr. Harrison for July 28, 2008.

  According to the parties, within a few days of the conference, Ms. Sperling forwarded a proposed settlement agreement and consent judgment to Mr. Harrison, which are attached as Exhibits A and B to Plaintiff's Memorandum of Law. The proposed agreement incorporates the aforementioned terms, and also contains terms which were not addressed at the conference, as will be set forth below. According to Imperial, after it received the proposed settlement agreement, the following then occurred:

> After Wilmington's submission of the written settlement agreement, Imperial determined through financials compiled by its accountant that the debt Imperial was currently servicing would render Imperial incapable of projecting complete performance of the settlement agreement. Imperial, by Mr. Holman and his partner, Bruce Bromberg, contacted counsel to advise that regardless of the term or amounts of the installments, Imperial could not project a sufficient cash flow to assure performance of the settlement agreement. Imperial's principals specifically requested that counsel reapproach Wilmington to renegotiate the settlement agreement.

Def.'s Mem. at 6. Mr. Harrison contacted Ms. Sperling to convey this information, after which they made various counter-proposals to each other, including Wilmington's proposal that Imperial agree to a $1 million consent judgment and Imperial's proposal that it pay Wilmington $10,000.

I learned of these events during the July 28 conference call. Ms. Sperling informed me that she forwarded a settlement agreement and consent judgment to Mr. Harrison, but that Imperial refused to sign on the ground that it could not afford to pay, and also that no financial records had been provided. Mr. Harrison confirmed that at the conference his client had agreed to pay in accordance with the terms reached, but that later his client reconsidered its financial picture and decided it was unable to pay and also that it thought the settlement agreement was not to its benefit. He stated that he had made a counter-proposal and would be providing financial records after he received them later that week. In view of the events at the settlement conference, and also given that the matter had at this point been referred to me for all purposes, I scheduled another

conference call to be held July 30, 2008, with both counsel and principals on the line. Ms. Sperling advised that her client's representative, Mr. Griffin, would participate, and Mr. Harrison advised that both Mr. Holman and his partner, Mr. Bromberg, would participate in the call.

The telephone conference proceeded as planned, although a Ms. Gibbons participated in Mr. Griffin's place on behalf of Wilmington.  The attorneys discussed the adequacy of the financials that were provided and what they demonstrated with respect to Imperial's cash flow, and Mr. Harrison expressed his client's inability to pay on the installments as planned and that Imperial had made a counter-proposal.  Mr. Harrison explained that Mr. Holman, with whom he had spoken during the July 17 settlement conference, did not do the company's bookkeeping, and that Mr. Holman did not realize until after conferring with others that Imperial could not satisfy the installment payments. Mr. Holman acknowledged during this call that he understood that he had entered a settlement agreement at the conference on behalf of Imperial.  Ms. Sperling stated that Wilmington was considering moving to enforce the settlement agreement, and I gave Wilmington two weeks in which to decide how to proceed.  Wilmington filed its motion on August 6, 2008.

      B.    **The Proposed Settlement Agreement**

The proposed written settlement agreement prepared by Wilmington is entitled "Settlement Agreement and Release."  See Pl.'s Memo. at  Ex. "A."  The proposed

agreement contains introductory background language and then numbered sections covering payment terms, sale of the properties, default, bankruptcy considerations, the consent judgment and releases.[4]  Imperial does not dispute that the written proposed settlement agreement, with certain specific exceptions, incorporates the agreement of the parties as reached at the settlement conference.

Imperial contends that the written agreement contains three provisions that were not mentioned at the settlement conference.  First, within section 4 addressing default, subsection 4(c) lists five scenarios that would place Imperial in default, including insolvency, filing bankruptcy, appointment of an authority to take charge, the issuance of a cease and desist order involving Imperial's viability, and an agreement to sell all or substantially all of its stock or assets.  Second (and related), section 5 entitled "Bankruptcy Considerations" provides that, upon a default under paragraph 4(c), for a period of 91 days after full payment under the agreement, "Wilmington shall have the right to file a claim in the bankruptcy court for all sums due and owing under the Broker Agreement," and Imperial "agrees not to bring or support any preference claim made by any person in connection with such bankruptcy filing."  Third, section 6, entitled "Releases," provides that Wilmington releases claims and persons as to rights "arising out

---

[4]The written agreement also contains additional clauses not at issue (confidentiality, familiarity with terms, binding agreement, severability, entire agreement, jurisdiction, governing law, counterparts, notices, captions, further assurances and construction).

of or in any way related to the Loans," defined as the loans on the three properties at issue in the case.

## II. DISCUSSION

Plaintiff Wilmington moves to enforce the agreement reached at the July 17 settlement conference on the grounds that the parties agreed on the material terms of settlement, that Imperial disavowed the settlement for the sole reason that Imperial had a "change of heart" about its financial condition, and that Imperial did not contest additional terms contained in the written settlement agreement until it responded to the present motion. See Pl.'s Memo. at 6-7; Pl.'s Reply at 2-3. Defendant Imperial argues that the parties only agreed upon the payment terms at the settlement conference, that Wilmington's proposed written agreement added essential terms that were never discussed or agreed upon, and as a result that the parties never reached a "meeting of the minds" on the written agreement. See Def.'s Memo. at 6-10.

Strong public policy favors settlements. See Transport Int'l Pool v. Alternative Transp., Inc., 2008 WL 2550598, at *4 (E.D. Pa. June 25, 2008) (citing Wilson v. Chester Co. Prison, 1998 WL 669930, at *2 (E.D. Pa. Sept. 28, 1998)). The question of whether settlement occurred is governed by state law. Tiernan v. DeVoe, 923 F.2d 1024, 1032-33 (3d Cir. 1991). It is undisputed that Pennsylvania law applies, and both parties rely on Pennsylvania law in support of their arguments. See Bankers Trust Co. v. Bethlehem Steel Corp., 752 F.2d 874, 882 (3d Cir. 1984) (applicable law is law of jurisdiction with

most interest in the dispute); see also Wyndmoor Learning Ctr. v. City of Wilmington, 1996 WL 117471, at *6 (E.D. Pa. Mar. 12, 1996) (finding Pennsylvania law applies because settlement negotiations occurred, and settlement agreement entered into, in Pennsylvania).

Under Pennsylvania law, ordinary principles of contract law govern settlement agreements. In re Cendant Corp. Prides Litig., 233 F.3d 188, 193 (3d Cir. 2000). "As with any contract, it is essential to the formation of a settlement agreement that 'the minds of the parties should meet upon all the terms, as well as the subject matter, of the [agreement].'" Thomas v. Univ. of Pa., 2007 WL 2891739, at *2 (E.D. Pa. Oct. 2, 2007) (quoting Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999)). An agreement is valid if "the parties mutually assent to the terms and conditions of the settlement." Transport Int'l Pool, 2008 WL 2550598, at *5 (quoting Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801, 803 (3d Cir. 1962)).

"[A]n agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970); Thomas, 2007 WL 2891739, at *2; Suber v. Peterson, 2006 WL 1582312, at *3 (E.D. Pa. June 2, 2006). "A 'settlement agreement is still binding even if . . . a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were

reduced to writing." Thomas, 2007 WL 2891739, at *2 (quoting Wyndmoor, 1996 WL 117471, at *6).

The question in this case boils down to whether the parties reached a settlement at the July 17 settlement conference, despite the discussions, drafts and proposals that took place afterward. The answer to this question is not a difficult one on these facts, and indeed Imperial does not dispute that at the end of the July 17 conference, it had reached an agreement to settle this case with Wilmington. That agreement contained terms for payment, terms for a consent judgment in the case of nonpayment and additional terms covering disposition of the properties. Nothing Imperial did or said at the conference suggested anything other than that it understood that it was bound. Although the agreement contained a contingency of proof of Imperial's limited finances – which contingency existed for the benefit of Wilmington and which could only be exercised by Wilmington – the contingency had no impact on the obligations of Imperial under the agreement. Imperial's arguments to the contrary are unavailing.

For example, Imperial argues that the settlement agreement cannot be enforced because the proposed written agreement contains terms that were never negotiated between the parties. See Def.'s Memo. at 6. Imperial's argument misses the mark because Wilmington's proposed written settlement agreement is not the agreement being enforced. Rather, the only agreement I can enforce is the agreement reached at the July

17 settlement conference, for which a written document is not required.  See Green, 436 F.2d at 390.

Imperial also argues that the parties did not agree as to the material terms of settlement, but that they agreed only to the subject matter of the agreement.  See Def.'s Memo. at 7.  To the contrary, I find that the parties not only agreed as to the subject matter of the agreement, but also to the specific monetary and other components of the settlement agreement.  To be precise, the parties agreed (1) that Imperial would arrange for the sale and closing of the three properties at issue by November 17, 2008, with Wilmington reserving the right to approve the amount of each sale and to continue the foreclosure actions involving each of the properties, (2) that Imperial would pay Wilmington the total sum of $80,000 over 21 months, commencing on August 15, 2008, with two initial monthly payments of $2,000 each, followed by 19 monthly payments of $4,000 each, and (3) in the event of Imperial's failure to pay as agreed, Wilmington would be permitted to enter a Confession of Judgment in the sum of $500,000 (subject to a cure period for any delay in an installment payment).  There is no dispute that these terms were negotiated by counsel and approved by the parties at the settlement conference before me.

Imperial has not raised lack of authority as a defense to enforcement, and for good reason.  It is undisputed that counsel for Imperial had express authority to settle the case as he appeared in person and conferred via telephone with Mr. Holman, a principal of

Imperial, before explicitly accepting the terms outlined above. Similarly, there is no suggestion that Mr. Holman lacked the authority to bind Imperial to a settlement agreement. Mr. Holman confirmed his authority and approval of the July 17 settlement in a telephone conference on July 30. While it may be true that Mr. Bromberg, who did not attend or otherwise participate in the settlement conference, had greater knowledge of Imperial's financial condition than did his partner Mr. Holman, that does not change the fact that Mr. Holman possessed full authority to bind Imperial to an enforceable agreement at the settlement conference – and that he did so. Therefore, Imperial's post-conference change of heart regarding its ability to perform as to the monetary terms of the settlement has no bearing on the question of whether the parties entered into an enforceable agreement at the conference. See Thomas, 2007 WL 2891739, at *2.

      Similarly, the fact that the proposed written settlement agreement contains terms that were not discussed at the settlement conference does not change the fact that Imperial and Wilmington had a meeting of the minds at the conference. The parties understood at the end of the conference that they had reached a settlement of the case, and that the agreement addressed the sale of the properties at issue by a date certain, the payment of certain sums by Imperial to Wilmington pursuant to a specific timetable, and entry of a confession of judgment in the event Imperial breached the agreement by failing to make a scheduled payment. See Transport Int'l Pool, 2008 WL 2550598, at *5 (settlement agreement is valid if parties mutually agree to terms and conditions of settlement). As

previously noted, Imperial concedes that the parties agreed to these terms at the settlement conference. The only reason the matter was not dismissed as settled at that point was that Wilmington had the right under the agreed-upon contingency to assess Imperial's claimed limited resources.

None of the terms Imperial has pointed to as being proposed for the first time in the written settlement agreement alters the underlying agreement of the parties. First, with respect to the default provisions contained in subsection 4(c), these terms were not discussed at the settlement conference and are therefore not part of the parties' agreement. By these provisions, Wilmington sought to add terms by which Imperial would be in default of its obligations under the agreement, including insolvency, bankruptcy and other similar conditions. Wilmington does not dispute that it did not raise these terms at the conference, and it cannot move to enforce them now. Similarly, the terms contained in section 5, which contemplates the parties' actions in bankruptcy should Imperial default under subsection 4(c), were also not discussed and are not enforceable.

The last term raised by Imperial is less straightforward. Imperial points out that the release provision in section 6 releases it only with respect to claims "arising out of or in any way related to the Loans" at issue in the case. Imperial complains that this "limited" release "was not commensurate with the consideration being offered by Imperial." Def.'s Mem. at 8-9. Imperial does not contend that the parties contemplated a

broader release at the time of the settlement conference. Indeed, the scope of the release was not discussed, and therefore was not understood by the parties to extend beyond the claims that were being settled in this case. Imperial's complaint that Wilmington should grant it a broader release "commensurate" with Imperial's consideration is beside the point on the question of the parties' agreement at the settlement conference.

To the extent the proposed settlement agreement contains other terms that were not discussed at the settlement conference, these terms are not part of the agreement reached at that time and are therefore not here being enforced. The parties are of course free to address these issues if they again attempt to reduce the settlement agreement to writing. I shall dismiss the matter as settled, but retain jurisdiction to enforce the parties' settlement agreement.

Finally, as the August 15, 2008, deadline for Imperial's payment of the first $2,000 installment has passed, my conclusion that the settlement agreement is binding places Imperial in default of the settlement agreement. In view of the fact that the parties were awaiting my ruling when the deadline passed, I will direct that Imperial's first two installments of $2,000 each (which were originally due on August 15 and September 15, 2008, respectively) be combined into a single $4,000 payment to be made on September 15, and that subsequent payments be made consistent with the timetable agreed upon by the parties at the settlement conference.

**III.     CONCLUSION**

The parties reached agreement as to the material aspects of settlement at the July 17, 2008, settlement conference held before me. Specifically, the parties agreed (1) that Imperial would have until November 17, 2008, to sell the three properties at issue, with Wilmington reserving the right to approve the amount of each sale and to continue the foreclosure actions involving each of the properties, (2) that Imperial would pay Wilmington the total sum of $80,000 over 21 months, commencing on August 15, 2008, with two initial monthly payments of $2,000 each, followed by 19 monthly payments of $4,000 each, and (3) in the event of Imperial's failure to make payments as agreed, Wilmington would be permitted to enter a Confession of Judgment in the sum of $500,000 (subject to written notice and an opportunity to cure). Therefore, Wilmington's motion to enforce will be granted as to those terms, modified only to the extent that Imperial's first two payments of $2,000 each be combined into a single $4,000 payment to be made on September 15, 2008.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILMINGTON FINANCE, INC., | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| IMPERIAL MORTGAGE CORP., | : | NO. 08-1292 |
| Defendant | | |

**O R D E R**

AND NOW, this       day of September, 2008, upon consideration of Plaintiff's Motion to Enforce Settlement (Doc. 21), Defendant's Memorandum of Law in opposition thereto (Doc. 22), and Plaintiff's Reply (Doc. 26), IT IS HEREBY ORDERED that the motion is GRANTED.

The settlement agreement reached at the July 17, 2008, settlement conference held before me is hereby enforced, as follows:

1. Defendant shall pay Plaintiff the sum of $80,000, to be paid in installments as follows: If not already paid in whole or in part, $4,000 on September 15, 2008 (the sum of the $2,000 installments originally due on August 15 and September 15, 2008, respectively); and $4,000 on the 15th of each month thereafter until the entire amount is satisfied;

2. Defendants shall have 120 days from the date of the settlement conference, that is until November 17, 2008, in which to sell the three properties at issue, subject to Wilmington's approval of the amount of the sale;

3. Plaintiff may continue to pursue foreclosure on the three properties; and

        4.        Defendant shall execute a consent judgment in Plaintiff's favor in the amount of $500,000, which Plaintiff will enforce only if Defendant fails to make payments in accordance with the above schedule, subject to Defendant's right to receive written notice of the default and an opportunity to cure the default.

IT IS FURTHER ORDERED that this case be DISMISSED pursuant to Local Rule 41.1(b), and that this court shall retain jurisdiction to resolve issues arising under the settlement agreement, including, but not limited to, enforcement of the settlement agreement. See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375 (1994).

                              BY THE COURT:

                              /s/ Elizabeth T. Hey
                              ELIZABETH T. HEY
                              UNITED STATES MAGISTRATE JUDGE